

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2013 JUL -8  AM 10: 29

CLERK'S OFFICE
AT BALTIMORE

BY____/lo____DEPUTY

**Dr. Orly Taitz, ESQ**

**29839 Santa Margarita Parkway, STE 100**

**Rancho Santa Margarita CA 92688**

**Tel: (949) 683-5411; Fax (949) 766-7603**

**E-Mail: <u>dr_taitz@yahoo.com</u>, orly.taitz@gmail.com**

**President of Defend Our Freedoms Foundation**

## UNITED STATES DISTRICT COURT

## FOR THE  DISTRICT OF

| | |
|---|---|
| **Orly Taitz** | **§ Case # 13-1878** |
| **Plaintiff,** | **§ Presiding** |
| | **§** |
| **v.** | **§  Appeal of De Facto Denial** |
| | **§  of FOIA Request under** |
| **Carolyn Colvin , Commissioner of the** | **§  5USC 552** |
| **Social Security Administration,** | **§** |
| | **§** |
| | **§** |
| | **§** |

# FIRST AMENDED COMPLAINT

## JURISDICTION

Complaint at hand is an appeal of a De Facto denial for production of documents under FOIA. As such the complaint involves a Federal statue 5USC552 and respondent is a Federal agency.

## PARTIES

Plaintiff -Dr. Orly Taitz, President of Defend Our Freedoms Foundation, California foundation, located at 29839 Santa Margarita, ste 100 Rancho Santa Margarita, CA 92688

Defendant -Carolyn W. Colvin, in her official capacity as the Commissioner of the Social Security Administration located in the state of Maryland.

## ALLEGATION

**This case is filed under 5USC 552 which states as follows:**

(a) Each agency shall make available to the public information as follows:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

(A) descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

(B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

(2) Each agency, in accordance with published rules, shall make available for public inspection and copying—

(A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

(B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

(C) administrative staff manuals and instructions to staff that affect a member of the public;

(D) copies of all records, regardless of form or format, which have been released to any person under paragraph (3) and which, because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; and

(E) a general index of the records referred to under subparagraph (D);

unless the materials are promptly published and copies offered for sale. For records created on or after November 1, 1996, within one year after such date, each agency shall make such records available, including by computer telecommunications or, if computer telecommunications means have not been established by the agency, by other electronic means. To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, staff manual, instruction, or copies of records referred to in subparagraph (D). However, in each case the justification for the deletion shall be explained fully in writing, and the extent of such deletion shall be indicated on the portion of the record which is made available or published, unless including that indication would harm an interest protected by the exemption in subsection (b) under which the deletion is made. If technically feasible, the extent of the deletion shall be indicated at the place in the record where the deletion was made. Each agency shall also maintain and make available for public inspection and copying current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published. Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supplements thereto unless it determines by order published in the Federal Register

that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of such index on request at a cost not to exceed the direct cost of duplication. Each agency shall make the index referred to in subparagraph (E) available by computer telecommunications by December 31, 1999. A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if—

(i) it has been indexed and either made available or published as provided by this paragraph; or

(ii) the party has actual and timely notice of the terms thereof.

(3)

(A) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which

(i) reasonably describes such records and

(ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

(B) In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

(C) In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system.

(D) For purposes of this paragraph, the term "search" means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.

(E) An agency, or part of an agency, that is an element of the intelligence community (as that term is defined in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a (4))) [1] shall not make any record available under this paragraph to—

(i) any government entity, other than a State, territory, commonwealth, or district of the United States, or any subdivision thereof; or

(ii) a representative of a government entity described in clause (i).

(4)

(A)

(i) In order to carry out the provisions of this section, each agency shall promulgate regulations, pursuant to notice and receipt of public comment, specifying the schedule of fees applicable to the processing of requests under this section and establishing procedures and guidelines for determining when such fees should be waived or reduced. Such schedule shall conform to the guidelines which shall be promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget and which shall provide for a uniform schedule of fees for all agencies.

(ii) Such agency regulations shall provide that—

(I) fees shall be limited to reasonable standard charges for document search, duplication, and review, when records are requested for commercial use;

(II) fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by an educational or noncommercial scientific institution, whose purpose is scholarly or scientific research; or a representative of the news media; and

(III) for any request not described in (I) or (II), fees shall be limited to reasonable standard charges for document search and duplication.

In this clause, the term "a representative of the news media" means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. In this clause, the term "news" means information that is about current events or that would be of current interest to the public. Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entities qualify as disseminators of "news") who make their products available for purchase by or subscription by or free distribution to the general public. These examples are not all-inclusive. Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities. A freelance journalist shall be regarded as working for a news-media entity if the journalist can demonstrate a solid basis for expecting publication through that entity, whether or not the journalist is actually employed by the entity. A publication contract would present a solid basis for such an expectation; the Government may also consider the past publication record of the requester in making such a determination.

(iii) Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

(iv) Fee schedules shall provide for the recovery of only the direct costs of search, duplication, or review. Review costs shall include only the direct costs incurred during the initial examination of a document for the purposes of determining whether the documents must be disclosed under this section and for the purposes of withholding any portions exempt from disclosure under this section. Review costs may not include any costs incurred in resolving issues of law or policy that may be raised in the course of processing a request under this section. No fee may be charged by any agency under this section—

(I) if the costs of routine collection and processing of the fee are likely to equal or exceed the amount of the fee; or

(II) for any request described in clause (ii) (II) or (III) of this subparagraph for the first two hours of search time or for the first one hundred pages of duplication.

(v) No agency may require advance payment of any fee unless the requester has previously failed to pay fees in a timely fashion, or the agency has determined that the fee will exceed $250.

(vi) Nothing in this subparagraph shall supersede fees chargeable under a statute specifically providing for setting the level of fees for particular types of records.

(vii) In any action by a requester regarding the waiver of fees under this section, the court shall determine the matter de novo: Provided, That the court's review of the matter shall be limited to the record before the agency.

(viii) An agency shall not assess search fees (or in the case of a requester described under clause (ii)(II), duplication fees) under this subparagraph if the agency fails to comply with any time limit under paragraph (6), if no unusual or exceptional circumstances (as those terms are defined for purposes of paragraphs (6)(B) and (C), respectively) apply to the processing of the request.

(B) On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

(C) Notwithstanding any other provision of law, the defendant shall serve an answer or otherwise plead to any complaint made under this subsection within thirty days after service upon the defendant of the pleading in which such complaint is made, unless the court otherwise directs for good cause shown.

[(D) Repealed. Pub. L. 98–620, title IV, § 402(2),Nov. 8, 1984, 98 Stat. 3357.]

(E)

(i) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.

(ii) For purposes of this subparagraph, a complainant has substantially prevailed if the complainant has obtained relief through either—

(I) a judicial order, or an enforceable written agreement or consent decree; or

(II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

(F)

(i) Whenever the court orders the production of any agency records improperly withheld from the complainant and assesses against the United States reasonable attorney fees and other litigation costs, and the court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, the Special Counsel shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding. The Special Counsel, after investigation and consideration of the evidence submitted, shall submit his findings and recommendations to the administrative authority of the agency concerned and shall send copies of the findings and recommendations to the officer or employee or his representative. The administrative authority shall take the corrective action that the Special Counsel recommends.

(ii) The Attorney General shall—

(I) notify the Special Counsel of each civil action described under the first sentence of clause (i); and

(II) annually submit a report to Congress on the number of such civil actions in the preceding year.

(iii) The Special Counsel shall annually submit a report to Congress on the actions taken by the Special Counsel under clause (i).

(G) In the event of noncompliance with the order of the court, the district court may punish for contempt the responsible employee, and in the case of a uniformed service, the responsible member.

(5) Each agency having more than one member shall maintain and make available for public inspection a record of the final votes of each member in every agency proceeding.

(6)

(A) Each agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall—

(i) determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination; and

(ii) make a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal. If on appeal the denial of the request for records is in whole or in part upheld, the agency shall notify the person making such request of the provisions for judicial review of that determination under paragraph (4) of this subsection.

The 20-day period under clause (i) shall commence on the date on which the request is first received by the appropriate component of the agency, but in any event not later than ten days after the request is first received by any component of the agency that is designated in the agency's regulations under this section to receive requests under this section. The 20-day period shall not be tolled by the agency except—

(I) that the agency may make one request to the requester for information and toll the 20-day period while it is awaiting such information that it has reasonably requested from the requester under this section; or

(II) if necessary to clarify with the requester issues regarding fee assessment. In either case, the agency's receipt of the requester's response to the agency's request for information or clarification ends the tolling period.

(B)

(i) In unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of subparagraph (A) may be extended by written notice to the person making such request setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days, except as provided in clause (ii) of this subparagraph.

(ii) With respect to a request for which a written notice under clause (i) extends the time limits prescribed under clause (i) of subparagraph (A), the agency shall notify the person making the request if the request cannot be processed within the time limit specified in that clause and shall provide the person an opportunity to

limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request. To aid the requester, each agency shall make available its FOIA Public Liaison, who shall assist in the resolution of any disputes between the requester and the agency. Refusal by the person to reasonably modify the request or arrange such an alternative time frame shall be considered as a factor in determining whether exceptional circumstances exist for purposes of subparagraph (C).

(iii) As used in this subparagraph, "unusual circumstances" means, but only to the extent reasonably necessary to the proper processing of the particular requests—

(I) the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;

(II) the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or

(III) the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein.

(iv) Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for the aggregation of certain requests by the same requestor, or by a group of requestors acting in concert, if the agency reasonably believes that such requests actually constitute a single request, which would otherwise satisfy the unusual circumstances specified in this subparagraph, and the requests involve clearly related matters. Multiple requests involving unrelated matters shall not be aggregated.

(C)

(i) Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph. If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records. Upon any determination by an agency to comply with a request for records, the records shall be made promptly available to such person making such request. Any notification of denial of any request for records under this subsection shall set forth the names and titles or positions of each person responsible for the denial of such request.

(ii) For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of

requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

(iii) Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

(D)

(i) Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests.

(ii) Regulations under this subparagraph may provide a person making a request that does not qualify for the fastest multitrack processing an opportunity to limit the scope of the request in order to qualify for faster processing.

(iii) This subparagraph shall not be considered to affect the requirement under subparagraph (C) to exercise due diligence.

(E)

(i) Each agency shall promulgate regulations, pursuant to notice and receipt of public comment, providing for expedited processing of requests for records—

(I) in cases in which the person requesting the records demonstrates a compelling need; and

(II) in other cases determined by the agency.

(ii) Notwithstanding clause (i), regulations under this subparagraph must ensure—

(I) that a determination of whether to provide expedited processing shall be made, and notice of the determination shall be provided to the person making the request, within 10 days after the date of the request; and

(II) expeditious consideration of administrative appeals of such determinations of whether to provide expedited processing.

(iii) An agency shall process as soon as practicable any request for records to which the agency has granted expedited processing under this subparagraph. Agency action to deny or affirm denial of a request for expedited processing pursuant to this subparagraph, and failure by an agency to respond in a timely manner to such a request shall be subject to judicial review under paragraph (4), except that the judicial review shall be based on the record before the agency at the time of the determination.

(iv) A district court of the United States shall not have jurisdiction to review an agency denial of expedited processing of a request for records after the agency has provided a complete response to the request.

(v) For purposes of this subparagraph, the term "compelling need" means—

(I) that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

(II) with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.

(vi) A demonstration of a compelling need by a person making a request for expedited processing shall be made by a statement certified by such person to be true and correct to the best of such person's knowledge and belief.

(F) In denying a request for records, in whole or in part, an agency shall make a reasonable effort to estimate the volume of any requested matter the provision of which is denied, and shall provide any such estimate to the person making the request, unless providing such estimate would harm an interest protected by the exemption in subsection (b) pursuant to which the denial is made.

(7) Each agency shall—

(A) establish a system to assign an individualized tracking number for each request received that will take longer than ten days to process and provide to each person making a request the tracking number assigned to the request; and

(B) establish a telephone line or Internet service that provides information about the status of a request to the person making the request using the assigned tracking number, including—

(i) the date on which the agency originally received the request; and

(ii) an estimated date on which the agency will complete action on the request.

(b) This section does not apply to matters that are—

(1)

(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and

(B) are in fact properly classified pursuant to such Executive order;

(2) related solely to the internal personnel rules and practices of an agency;

(3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute—

(A)

(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

(B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information

(A) could reasonably be expected to interfere with enforcement proceedings,

(B) would deprive a person of a right to a fair trial or an impartial adjudication,

(C) could reasonably be expected to constitute an unwarranted invasion of personal privacy,

(D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source,

(E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or

(F) could reasonably be expected to endanger the life or physical safety of any individual;

(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(9) geological and geophysical information and data, including maps, concerning wells.

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

(c)

(1) Whenever a request is made which involves access to records described in subsection (b)(7)(A) and—

(A) the investigation or proceeding involves a possible violation of criminal law; and

(B) there is reason to believe that

(i) the subject of the investigation or proceeding is not aware of its pendency, and

(ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings,

the agency may, during only such time as that circumstance continues, treat the records as not subject to the requirements of this section.

(2) Whenever informant records maintained by a criminal law enforcement agency under an informant's name or personal identifier are requested by a third party according to the informant's name or personal identifier, the agency may treat the records as not subject to the requirements of this section unless the informant's status as an informant has been officially confirmed.

(3) Whenever a request is made which involves access to records maintained by the Federal Bureau of Investigation pertaining to foreign intelligence or counterintelligence, or international terrorism, and the existence of the records is classified information as provided in subsection (b)(1), the Bureau may, as long as the existence of the records remains classified information, treat the records as not subject to the requirements of this section.

(d) This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section. This section is not authority to withhold information from Congress.

(e)

(1) On or before February 1 of each year, each agency shall submit to the Attorney General of the United States a report which shall cover the preceding fiscal year and which shall include—

(A) the number of determinations made by the agency not to comply with requests for records made to such agency under subsection (a) and the reasons for each such determination;

(B)

(i) the number of appeals made by persons under subsection (a)(6), the result of such appeals, and the reason for the action upon each appeal that results in a denial of information; and

(ii) a complete list of all statutes that the agency relies upon to authorize the agency to withhold information under subsection (b)(3), the number of occasions on which each statute was relied upon, a description of whether a court has upheld the decision of the agency to withhold information under each such statute, and a concise description of the scope of any information withheld;

(C) the number of requests for records pending before the agency as of September 30 of the preceding year, and the median and average number of days that such requests had been pending before the agency as of that date;

(D) the number of requests for records received by the agency and the number of requests which the agency processed;

(E) the median number of days taken by the agency to process different types of requests, based on the date on which the requests were received by the agency;

(F) the average number of days for the agency to respond to a request beginning on the date on which the request was received by the agency, the median number of days for the agency to respond to such requests, and the range in number of days for the agency to respond to such requests;

(G) based on the number of business days that have elapsed since each request was originally received by the agency—

(i) the number of requests for records to which the agency has responded with a determination within a period up to and including 20 days, and in 20-day increments up to and including 200 days;

(ii) the number of requests for records to which the agency has responded with a determination within a period greater than 200 days and less than 301 days;

(iii) the number of requests for records to which the agency has responded with a determination within a period greater than 300 days and less than 401 days; and

(iv) the number of requests for records to which the agency has responded with a determination within a period greater than 400 days;

(H) the average number of days for the agency to provide the granted information beginning on the date on which the request was originally filed, the median number of days for the agency to provide the granted information, and the range in number of days for the agency to provide the granted information;

(I) the median and average number of days for the agency to respond to administrative appeals based on the date on which the appeals originally were received by the agency, the highest number of business days taken by the agency to respond to an administrative appeal, and the lowest number of business days taken by the agency to respond to an administrative appeal;

(J) data on the 10 active requests with the earliest filing dates pending at each agency, including the amount of time that has elapsed since each request was originally received by the agency;

(K) data on the 10 active administrative appeals with the earliest filing dates pending before the agency as of September 30 of the preceding year, including the number of business days that have elapsed since the requests were originally received by the agency;

(L) the number of expedited review requests that are granted and denied, the average and median number of days for adjudicating expedited review requests, and the number adjudicated within the required 10 days;

(M) the number of fee waiver requests that are granted and denied, and the average and median number of days for adjudicating fee waiver determinations;

(N) the total amount of fees collected by the agency for processing requests; and

(O) the number of full-time staff of the agency devoted to processing requests for records under this section, and the total amount expended by the agency for processing such requests.

(2) Information in each report submitted under paragraph (1) shall be expressed in terms of each principal component of the agency and for the agency overall.

(3) Each agency shall make each such report available to the public including by computer telecommunications, or if computer telecommunications means have not been established by the agency, by other electronic means. In addition, each agency shall make the raw statistical data used in its reports available electronically to the public upon request.

(4) The Attorney General of the United States shall make each report which has been made available by electronic means available at a single electronic access point. The Attorney General of the United States shall notify the Chairman and ranking minority member of the Committee on Government Reform and Oversight of the House of Representatives and the Chairman and ranking minority member of the Committees on Governmental Affairs and the Judiciary of the Senate, no later than April 1 of the year in which each such report is issued, that such reports are available by electronic means.

(5) The Attorney General of the United States, in consultation with the Director of the Office of Management and Budget, shall develop reporting and performance guidelines in connection with reports required by this subsection by October 1, 1997, and may establish additional requirements for such reports as the Attorney General determines may be useful.

(6) The Attorney General of the United States shall submit an annual report on or before April 1 of each calendar year which shall include for the prior calendar year a listing of the number of cases arising under this section, the exemption involved in each case, the disposition of such case, and the cost, fees, and penalties assessed under subparagraphs (E), (F), and (G) of subsection (a)(4). Such report shall also include a description of the efforts undertaken by the Department of Justice to encourage agency compliance with this section.

(f) For purposes of this section, the term—

(1) "agency" as defined in section 551 (1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency; and

(2) "record" and any other term used in this section in reference to information includes—

(A) any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format; and

(B) any information described under subparagraph (A) that is maintained for an agency by an entity under Government contract, for the purposes of records management.

(g) The head of each agency shall prepare and make publicly available upon request, reference material or a guide for requesting records or information from the agency, subject to the exemptions in subsection (b), including—

(1) an index of all major information systems of the agency;

(2) a description of major information and record locator systems maintained by the agency; and

(3) a handbook for obtaining various types and categories of public information from the agency pursuant to chapter 35 of title 44, and under this section.

(h)

(1) There is established the Office of Government Information Services within the National Archives and Records Administration.

(2) The Office of Government Information Services shall—

(A) review policies and procedures of administrative agencies under this section;

(B) review compliance with this section by administrative agencies; and

(C) recommend policy changes to Congress and the President to improve the administration of this section.

(3) The Office of Government Information Services shall offer mediation services to resolve disputes between persons making requests under this section and administrative agencies as a non-exclusive alternative to litigation and, at the discretion of the Office, may issue advisory opinions if mediation has not resolved the dispute.

(i) The Government Accountability Office shall conduct audits of administrative agencies on the implementation of this section and issue reports detailing the results of such audits.

(j) Each agency shall designate a Chief FOIA Officer who shall be a senior official of such agency (at the Assistant Secretary or equivalent level).

(k) The Chief FOIA Officer of each agency shall, subject to the authority of the head of the agency—

(1) have agency-wide responsibility for efficient and appropriate compliance with this section;

(2) monitor implementation of this section throughout the agency and keep the head of the agency, the chief legal officer of the agency, and the Attorney General appropriately informed of the agency's performance in implementing this section;

(3) recommend to the head of the agency such adjustments to agency practices, policies, personnel, and funding as may be necessary to improve its implementation of this section;

(4) review and report to the Attorney General, through the head of the agency, at such times and in such formats as the Attorney General may direct, on the agency's performance in implementing this section;

(5) facilitate public understanding of the purposes of the statutory exemptions of this section by including concise descriptions of the exemptions in both the agency's handbook issued under subsection (g), and the agency's annual report on this section, and by providing an overview, where appropriate, of certain general categories of agency records to which those exemptions apply; and

(6) designate one or more FOIA Public Liaisons.

(l) FOIA Public Liaisons shall report to the agency Chief FOIA Officer and shall serve as supervisory officials to whom a requester under this section can raise concerns about the service the requester has received from the FOIA Requester Center, following an initial response from the FOIA Requester Center Staff. FOIA Public Liaisons shall be responsible for assisting in reducing delays, increasing transparency and understanding of the status of requests, and assisting in the resolution of disputes

1. **Plaintiff submitted a request for information under Freedom of Information Act 5USC552.**

2. **Request was submitted to the FOIA unit of the Social Security Administration, (Hereinafter SSA), on April 26, 2013 by Certified mail.**

3. **Request was indeed received by SSA.**

4. **Request for information was accompanied by required fee.**

5. **Plaintiff sought SS-5, Social Security application for three individuals, among them Harrison J. Bounel, born in 1890.**

6. **Usual time frame for FOIA response is 20 days.**

7. **Petitioner did not receive a response.**

Taitz v Colvin First Amended Complaint                                    17

8. Plaintiff submitted a second request.

9. Plaintiff did not receive any information for any of the three individuals for a period of 67 days, more than twice the usual and ordinary turn around period.

10. Plaintiff believes that the Social Security number of Harrison J. Bounel is currently being used to commit fraud and therefore believes that there is an urgency in obtaining the SS-5 for Harrison J. Bounel.

11. Plaintiff provides attached herein as an Exhibit 1, a copy of the official 1940 census, released in 2011, showing that Harrison J. Bounel was 50 years old in 1940, therefore he was born in 1890 and he would be 123 today, if he would be alive.

12. Plaintiff attaches herein as an Exhibit 2, report of the Chief FOIA officer of the Social Security administration, which states that according to "120 year rule" implemented by the SSA in 2010, individuals of 120 years old or older are classified as "extremely aged individuals", whose SS-5, Social Security applications have to be released under FOIA without proof of death of the individual.

CONCLUSION

Based on "120 year rule" SS-5, Social Security application of Harrison J. Bounel has to be released to the plaintiff, as Harrison J. Bounel was born in

1890 and is considered an extremely aged individual under 120 year rule, whose SS-5 has to be released to the public without consent or proof of death.

**Prayer for Relief**

1. Production of SS-5 for Harrison J. Bounel, born 1890.

2. Attorneys' fees

3. Any other relief the court finds just and appropriate.

07.05 2013

/s/ Orly Taitz ESQ, President of DOFF

**EXHIBIT 1**



**EXHIBIT 2**

## Chief FOIA Officer Report for 2011

**I.** **Steps Taken to Apply the Presumption of Openness**

**1.** **Describe the steps your agency has taken to ensure that the presumption of openness is being applied to all decisions involving the FOIA.**

The Social Security Administration (SSA) has always taken pride in our level of service to the public. In that tradition, we continue to use the President's Memorandum and the Attorney General's Guidance to ensure that staff throughout the agency understand and implement the presumption of openness when they respond to FOIA requests.

Throughout the year, two agency components, the Office of Disability Adjudication and Review and the Office of Systems, were the subject of a high volume of FOIA requests. We initiated meetings with Agency FOIA coordinators in these offices to discuss the FOIA requests and proactively sought opportunities to promote the open government directive to respond to them.

**a.** **Describe how the President's FOIA Memorandum and the Attorney General's FOIA Guidelines have been publicized throughout your agency.**

We have publicized the President's FOIA Memorandum and the Attorney General's FOIA Guidelines through the following activities:

- The Chief FOIA Officer issued a memorandum to senior staff stating the FOIA policy that agencies must apply a presumption in favor of disclosure when responding to a FOIA request.

- We designed an information packet that we distributed to the agency's FOIA coordinators and posted on our Intranet website. The packet includes several items, including copies of the OPEN Government Act of 2007, the President's FOIA Memorandum and corresponding Attorney General's FOIA Guidelines, and the Chief FOIA Officer's memorandum to senior staff regarding the new FOIA guidance and presumptive disclosure policy. The packet also contains the FOIA response deadlines, the list of SSA FOIA coordinators, and a statement regarding their responsibilities for the FOIA annual report.

**b. What training has been attended and/or conducted on the new FOIA Guidelines?**

- In 2010, the Office of Privacy and Disclosure (OPD) in the Office of the General Counsel (OGC), which serves as SSA's FOIA office, gave presentations on implementing the new FOIA guidelines at the New OGC Employee Training Session in March, the OPD Biennial Conference in July, and the Annual OGC Conference held in September.

- We continue to revise and update our in-house FOIA/Privacy Act training program instituted last year that focuses on the various technical, legal, and "hands-on" issues involved in processing FOIA requests. The training ensures that analysts understand the importance of presumptive disclosures, and allows us to discuss recent disclosure issues and examine new opportunities for preparing future disclosures.

- We continued our commitment to encourage and provide staff the opportunity to attend outside FOIA training. Staff attended FOIA training sponsored or supported by agencies and organizations like the Department of Justice, the American Society of Access Professionals, and the International Association of Privacy Professionals. This training included all aspects of FOIA, including those that focused on a basic FOIA overview, open government principles, presumptive disclosure, and privacy policy. The training also included multiple "hands on" workshops.

**c. How has your agency created or modified your internal guidance to reflect the presumption of openness?**

- We have developed a more collaborative relationship with agency FOIA coordinators. This improved relationship ensures that they have our support when conducting extensive searches to provide the most complete and timely responses possible. This approach includes assisting the coordinators when obtaining and reviewing information to ensure that they apply the presumption of openness.

- We are performing more peer reviews and collaborating with other offices in our agency that continually provide us with documents in response to FOIA requests to ensure that we release the maximum amount of information possible. We are also focusing on the discretionary exemptions, such as exemption 2 and exemption 5.

- We have revisited longstanding decisions regarding the withholding of certain frequently requested data, to determine if our recommended guidance is still applicable and reflects the presumption of openness.  For instance, we issued new guidance for disclosing extremely aged individuals' original Social Security Applications (SS-5) when our records do not indicate a date of death.  We developed a new policy that establishes a "120 year rule" and assumes that an individual is alive unless their birth date exceeds 120 years or we have proof of the individual's death.  This new policy enabled us to release more information and potentially reduced requests on appeal.

d. **To what extent has your agency made discretionary releases of otherwise exempt information?**

- We review every request with the intent to release as much information as possible.  We no longer withhold information that would be exempt under exemption 2 (low) of the FOIA.  For example, we now release transmittal sheets, route slips, and cover sheets that would cause no harm if released.

- We developed new procedures to review "sensitive" Program Operations Manual System (POMS) with the responsible components.  After this review, we released some information from the POMS that we previously had designated as "sensitive."

- In 2009, we formed a workgroup to review our analyses for some of our most frequently requested types of documents.  For example, we receive many requests for Appeals Council Working Papers (ACWP).  Because of the ACWP workgroup's activity, we proactively released routine information that previously we withheld under exemption 2 (low), such as transmittal sheets, route slips, and cover sheets.  In addition, under exemption 5, we released in full additional segregable portions of ACWP documents.

e. **What exemptions would have covered the information that was released as a matter of discretion?**

- We released information in the examples above that we previously withheld pursuant to FOIA Exemption 2 (low) and (high) and FOIA Exemption 5.

f. **How does your agency review records to determine whether discretionary releases are possible?**

- We use peer reviews and legal reviews, and often consult with the owner(s) of the records to apply the presumption of openness. We also review our guidance on release of frequently requested documents to determine if it is consistent with the presumption of openness.

g. **Describe any other initiatives undertaken by your agency to ensure that the presumption of openness is being applied.**

- We continuously emphasize to our FOIA coordinators and other agency staff the importance of government openness, and their responsibility to ensure that we are providing the most information to the public. When necessary, we conduct meetings and conference calls with them. In particularly difficult cases, we consult with the Department of Justice to assist us in making decisions on discretionary releases.

- Our management team meets regularly to review the progress of the oldest cases. In these meetings, staff updates our managers on developing, searching, and reviewing cases, and assistance they need to move the cases to closure. We now have a round-table discussion to assist analysts with particularly complex cases. We use a team approach that includes input from managers, senior FOIA analysts, and peers on the best ways to analyze, review, and research requests.

- We work closely with the Office of the Chief Information Officer to be proactive when disclosing information to the public through our Open Government initiatives. We disclose statistical information about SSA's workloads, processing times, and Administrative Law Judge disposition rates.

2. **Report the extent to which the numbers of requests where records have been released in full and the numbers of requests where records have been released in part has changed from those numbers as reported in your previous year's Annual FOIA Report.**

In our FY 2010 Annual FOIA report, we reported an increase in the number of full releases from 26,344 in FY 2009 to 31,099 in FY 2010. The number of partial grants decreased from 3005 in FY 2009 to 1507 in FY 2010.

We believe that our consistent attention to the openness principle has contributed to our increase in full releases. However, the reduction in partial releases is harder to determine. The reduction in partial releases may be attributed to the type of FOIA requests that we typically receive. For instance, the vast majority of cases we process at

SSA request personal information regarding living individuals.  The requested records contain medical, health, financial, and other personal information about social security claimants, and often ask for the earnings records for millions of people.  We usually withhold this type of information for personal privacy reasons under FOIA Exemption 6.  In addition, the Internal Revenue Code protects most of the earnings information we possess and requires us to exempt this information from disclosure under FOIA Exemption 3.  These exemptions leave us little or no room for discretionary disclosures.

Therefore, for this portion of the report, we think that the most meaningful statistics relate to the number of cases to which we applied Exemptions 2 and 5, as the FOIA permits agencies more discretion to disclose under these exemptions.  For instance, the number of times we applied these exemptions for initial requests decreased between FY 2009 and FY 2010 as follows:

| Exemption 2 | Exemption 5 |
|---|---|
| FY 2009—applied 69 times | FY 2009—applied 86 times |
| FY 2010—applied 66 times | FY 2010—applied 75 times |

## II.   Steps Taken to Ensure that Your Agency has an Effective System in Place For Responding to Requests

**Describe here the steps your agency has taken to ensure that your system for responding to requests is effective and efficient.  This section should include a discussion of how your agency has addressed the key roles played by the broad spectrum of agency personnel who work with FOIA professionals in responding to requests, including, in particular, steps taken to ensure that FOIA professionals have sufficient IT support.  To do so, answer the questions below and then include any additional information that you would like to describe how your agency ensures that your FOIA system is efficient and effective.**

a.   **Do FOIA professionals within your agency have sufficient IT support?**

Yes.  We have sufficient IT support for the FOIA professionals at our agency.  We have a team within our Office of Systems dedicated to providing maintenance and support for our electronic Freedom of Information System (eFOIA).  We also have direct access to IT support to post frequently requested documents to our internet sites.

b.   **Describe how your agency's FOIA professionals interact with your Open Government Team.**

OPD and the agency's Office of Open Government (OOG) maintain an extremely close working relationship on an ongoing basis. Accordingly, OPD was a key collaborator with OOG in developing the agency's Open Government Plan in FY 2010. OPD FOIA analysts served on several project workgroups and authored significant sections of the plan.

As a main stakeholder in the plan, OPD also played a central role in reviewing and refining various drafts of the plan, which included a scored evaluation by an independent outside reviewer. This evaluation rendered the highest possible score for the sections related to FOIA. Our staff continued to work with OOG on an on-going basis up through the plan's publication on June 24, 2010.

Additionally, OPD senior leadership and FOIA analysts serve on the agency's Open Government Steering Committee. The Committee confers on a regular basis on all aspects of Open Government, and provides ongoing oversight of the agency's Data Inventory and Plan for Releasing High Value Data.

c. **Describe the steps your agency has taken to assess whether adequate staffing is being devoted to responding to FOIA requests.**

We are continuously looking at our case processing system to ensure that we are processing FOIA requests in the most effective and efficient manner, and that we have experienced staff assigned to appropriate requests. To ensure the optimum use of staff within our FOIA office, we streamlined the procedure by which we assign FOIA requests to senior analysts and to the analysts who actually process the requests. Senior analysts now have the major role in the initial development and coordination of FOIA requests sent to our components to obtain requested documents. We continue to provide training to our new analysts to prepare them to handle FOIA requests. In addition, we recently hired an intern to assist the in-take FOIA process and one FOIA analyst to process requests. With the additional staff and the continuous training, we have been able to reduce our backlog from 90 in FY 2009 to 68 in FY 2010.

This fiscal year, we reassessed our process for obtaining requested documents. We stressed that components must have adequate staffing to respond timely and accurately when searching for agency records. We also conducted training for staff in our component offices to ensure they are aware of their responsibilities under the FOIA.

d. **Describe any other steps your agency has undertaken to ensure that your FOIA system operates efficiently and effectively.**

Taitz v Colvin First Amended Complaint                                          29

We are always looking for ways to enhance the eFOIA case processing system. We are committed to using technology to enhance our capabilities. In 2007, we implemented a new browser-based platform, called eFOIA, which we designed specifically to automate much of the workflow for handling Privacy Act and FOIA requests. In FY 2010, we released four updates to the system with two more systems improvements scheduled for release soon.

### III.  Steps Take to Increase Proactive Disclosures

**Describe here the steps your agency has taken to increase the amount of material that is available on your agency website, including providing examples of proactive disclosures that have been made since issuance of the new FOIA Guidelines. In doing so, answer the questions listed below and describe any additional steps taken by your agency to make proactive disclosures of information.**

a.  **Has your agency added new material to your agency website since last year?**

Yes. Our FOIA Reading Room page (http://www.ssa.gov/foia/html/frd.htm) contains links to information made available to the public by several agency components in the past year. Examples of these releases are testimony given by agency officials before Congress during FY 2010, Office of the Inspector General (OIG) Audit Reports, FY 2010 Press Releases, and Budget Reports.

In addition, our FOIA Reading Room contains a link to data sets and informational holdings the agency has posted to data.gov in support of our Open Government Plan. During FY 2010, the agency released 20 data sets on data.gov containing information not previously available to the public. Many of the data sets contain statistical tables of information compiled in response to an identified public need and demand, particularly from the research community. Previously, the information in these files was available only through a FOIA request.

b.  **What types of records have been posted?**

Please see our response to the previous question. We received a high volume of requests for data sets, and we have posted statistical data regarding SSA's work processes, as well as surveys, and reports.

c.  **Give examples of the types of records your agency now posts that used to be available only by making a FOIA request for them.**

Examples include the following:

Taitz v Colvin First Amended Complaint                                    30

- Administrative Law Judge (ALJ) disposition data
- Hearing Office Dispositions per ALJ per Day Rate Ranking Report
- Number of Hearings Held In-Person or via Video-Conferencing
- Hearing Office Average Processing Time Ranking Report
- Hearing Office Workload Data
- NETSTAT Report—(the average amounts of time it takes for various appeals to move to various levels)
- SSA State Agency Workload Data

**d.   What system do you have in place to routinely identify records that are appropriate for posting?**

Our eFOIA case processing system automatically identifies frequently requested items that we consider for posting to our Reading Room. Senior analysts also flag frequently requested documents and sensitive requests for Reading Room consideration.

**e.    How do you utilize social media in disseminating information?**

SSA has begun to utilize social media on many popular sites, including Facebook, Twitter, and YouTube. Our presence on these sites allows wider dissemination of information to the public, including press releases, informational videos on our programs and services, and frequently requested material such as our most popular baby names list.

We have also implemented idea-sharing technology provided by IdeaScale, to inform and obtain feedback from the public on our Open Government initiatives, and have contracted with a cloud-computing provider to implement a more interactive "frequently asked questions" section of our website, "SSA's Online Answers Knowledgebase."

f.    Describe any other steps taken to increase proactive disclosures at your agency.

We continuously search for ways to be more proactive in providing the most access to the public:

- We are in the process of re-designing our FOIA Reading Room to be more user-friendly and to link to other sites that may be of interest to the public.

- We continue to work with our FOIA coordinators throughout the agency to help us identify information that would be of interest to the public and could be posted to our website for public access.

- We continuously post new links on the FOIA Reading Room for information that may be of interest to the public, even if this information is available elsewhere. We have linked to information on the agency's budget and performance information, our international agreements, our Exhibit 300s (major IT investments), and provided information regarding payments under the American Recovery and Reinvestment Act of 2009.

## IV.  Steps Taken to Greater Utilize Technology

**A key component of the President's FOIA Memorandum was the direction to "use modern technology to inform citizens about what is known and done by their Government." In addition to using the internet to make proactive disclosures, agencies should also be exploring ways to utilize technology to respond to requests. In 2010 agencies reported widespread use of technology in handling FOIA request. For this section of your Chief FOIA Officer Report for 2011, please answer the following more targeted questions:**

1.  **Electronic receipt of FOIA requests:**

a.  **What proportions of the components within your agency which receive FOIA requests have the capability to receive such requests electronically?**

SSA has a centralized FOIA process staffed by FOIA professionals at our headquarters in Baltimore, MD. Our headquarters staff receives and processes all FOIA requests electronically via our eFOIA system. We receive FOIA requests through email, commercial mail services, via fax, or from other SSA components

in paper form and then scan and process them electronically within the eFOIA system.

**b.  To what extent have you increased the number of components doing so since the filing of your last Chief FOIA Officer Report?**

N/A

**c.  What methods does your agency use to receive requests electronically?**

Our eFOIA system offers an online service via the Internet that allows members of the public to make FOIA requests and pay online.  We also use an e-mail account to receive FOIA requests, and we receive requests via FAX.

**2.   Electronic tracking of FOIA request:**

**a.  What proportion of components within your agency which receive FOIA requests have the capability to receive such requests electronically?**

SSA has a centralized FOIA process at our headquarters in Baltimore, and we have the capability to receive requests electronically.

**b.  To what extent have you increased the number of components doing so since the filing of your last Chief FOIA Officer Report?**

N/A

**c.   What methods does your agency use to track requests electronically?**

We capture, maintain, and track FOIA requests through our eFOIA system. eFOIA is a web-based work management Intranet and Internet system that we use to control, manage, and process FOIA requests.

**3.   Electronic process of FOIA requests:**

**a.  What proportion of components within your agency which receive FOIA requests have the capability to process such requests electronically?**

As answered above, we have a centralized electronic FOIA process.

b. **To what extent have you increased the number of components doing so since the filing of your last Chief FOIA Officer Report?**

N/A

c. **What methods does your agency use to process requests electronically?**

Our agency uses the eFOIA system to receive, track, manage, and process FOIA requests. In addition to electronic requests we receive via the Internet, we receive other requests through regular mail, commercial mail services, via fax, or from other SSA components in paper form. We electronically scan and process these requests within the eFOIA system.

4. **Electronic preparation of your Annual FOIA report:**

a. **What type of technology does your agency use to prepare your agency's Annual FOIA Report, i.e. specify whether the technology is FOIA-specific or a generic data-processing system.**

We use eFOIA, a modified commercial off the shelf product, to prepare our Annual FOIA Report. The eFOIA system is a web-based system specifically designed to process electronic and paper FOIA requests. Our eFOIA system captures most of the data we need to prepare our annual report.

b. **If you are not satisfied with your existing system to prepare your Annual FOIA Report, describe the steps you have taken to increase your use of technology for next year.**

The eFOIA system provides us with an efficient mechanism to manage, track, and control the FOIA workload and to prepare the Annual FOIA Report as required by DOJ.

V. **Steps Taken to Reduce Backlogs and Improve Timeliness in Responding to Requests**

1. **If your agency has a backlog, report here whether that backlog is decreasing. That reduction should be measured in two ways. First, report whether the number of backlogged requests and backlogged administrative appeals that remain pending at the end of the fiscal year decreased or increased, and by how many, when compared with last fiscal year. Second, report whether your agency closed in**

**Fiscal Year 2010 the ten oldest of those pending requests and appeals from Fiscal Year 2009, and if not, report how many of them your agency did close.**

Although we have a minimal backlog, we decreased both our initial case backlog and our administrative appeal backlog in FY 2010 as follows:

| Initial Cases | Administrative Appeal Cases |
|---|---|
| FY 2009—90 | FY 2009—9 |
| FY 2010—68 | FY 2010—3 |

We closed the ten oldest pending requests and appeals from FY 2009 in FY 2010.

2.   **If there has not been a reduction in the backlog as measured by either of these metrics, describe why that has occurred.  In doing so, answer the following questions and then include any other additional explanation.**

N/A.  During FY 2010, our backlog decreased.

3.   **Describe the steps your agency is taking to reduce any backlogs and to improve timeliness in responding to requests and administrative appeals.  In doing so answer the following questions and then also include any other steps being taken to improve timeliness.**

    a.  **Does your agency routinely set goals and monitor the progress of your FOIA caseload?**

    Yes.  We conduct bi-weekly meetings with management and senior analysts to set milestones and to monitor our backlog to assess the status of old cases, identify the cause for any delay, and to reduce this workload as quickly as possible.

    b.  **Has your agency increased its FOIA staffing?**

    Yes.  We hired an additional full-time analyst and an intern to improve our overall FOIA process.

    c.  **Has your agency made IT improvements to increase timeliness?**

    No.  However, we will continue to evaluate the need for system improvements.

**d. Has your agency Chief FOIA Officer been involved in overseeing your agency's capacity to process requests?**

Yes. The Chief FOIA Officer is instrumental in promoting the importance of FOIA within the agency. He championed our need for additional staff to improve the agency FOIA process, as well as highlighted the importance of the FOIA and Open government to senior staff. He also encourages and ensures that OPD staff is able to attend appropriate training.

<u>**Spotlight on Success**</u>

**Out of all the activities undertaken by your agency in this last year to increase transparency, describe here one success story that you would like to highlight as emblematic of your efforts.**

In the past year, we have increased our presence on social media sites, such as Facebook, YouTube, and Twitter. Our use of these applications provides a new and versatile outlet for communicating our programs and new initiatives, and allowed transparent public dialogue about them. For instance, our postings on Facebook have already generated hundreds of public comments, acting as a valuable outlet for those wishing to either praise our programs and services, or provide critiques of how we might improve.

We continue to explore new and creative ways in which to expand our use of these applications to increase public awareness and transparency.